IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-01688-PAB-MEH

ALISON D. JONES,

    Plaintiff,

v.

PEOPLEREADY INC.,

    Defendant.

---

### RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Michael E. Hegarty, United States Magistrate Judge**.

Before the Court is the Motion to Dismiss by Defendant, "PeopleReady Inc.," (as it clarifies in its Motion the spacing and punctuation of its name). ECF 46. The Motion is fully briefed, and the Court finds that oral argument will not materially assist in its adjudication. Based on the record herein and for the reasons that follow, the Court recommends that the Motion be granted.

### BACKGROUND

**I.  Claims for Relief**

Plaintiff sues Defendant for not paying her timely as required by the Colorado Wage Claim Act, Colo. Rev. Stat. § 8-4-103(1)(a), ("CWCA"). Plaintiff next contends that Defendant responded to her wage payment demand by terminating her employment, for which she brings a claim of unlawful retaliation in violation of both the CWCA and the federal Fair Labor Standards Act, 29 U.S.C. § 215(a), ("FLSA"). Lastly, Plaintiff brings a Title VII claim under 42 U.S.C. § 2000e-2 for race and sex discrimination.

For purposes of this ruling, the Court accepts as true the factual allegations—but not any legal conclusions, bare assertions, or conclusory allegations—that Plaintiff raises in her Second Amended Complaint ("SAC") (ECF 36). *See generally Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (accepting as true a plaintiff's factual allegations for purposes of Fed. R. Civ. P. 12(b)(6) analysis). Given her *pro se* status, the Court construes her pleadings broadly. The Court also refers to the previous iterations of her complaint for additional background and context where helpful to better understand her claims for relief. *Vreeland v. Huss*, No. 18-cv-00303-PAB-SKC, 2021 WL 1171670, at *5 (D. Colo. Mar. 29, 2021); *Lassley v. Aminokit Labs., Inc.*, No. 15-cv-01531-REB-MJW, 2015 WL 9437879, at *1 (D. Colo. Nov. 18, 2015) (permitting a court's consideration of prior pleadings).

**II.    Alleged Facts**

For over ten years Defendant employed Plaintiff. ECF 1 at 25. Plaintiff was a temporary worker who Defendant assigned to job sites to fill other businesses' short-term staffing needs. The SAC lists several businesses where she had worked as temporary staff going back to June 2019. ECF 36 at 6-8, 11.

She recounts incidents of reverse race discrimination and sexual harassment that she experienced at those different workplaces. She does not say that any Defendant employee was involved in those alleged discriminatory acts. Rather, she complains about comments and threatening behavior by the respective *client* employees as well as by members of the public and even her own acquaintances. *Id*. Defendant's clients (who operated the job sites) mostly did not intervene, Plaintiff complains, although she notes exceptions when they called police or security guards to assist her. *Id*. at 7.

She brings her claim for relief on the theory that Defendant "can be held liable for discrimination occurring at client job sites if [it was] reasonably aware of [the discrimination but] did nothing to stop it." *Id*. at 6. She contends that Defendant should have known of the situations. She acknowledges that it would be the client who requested Defendant not to return her to the job site, but such requests require the client to state a reason. She awaits discovery to obtain those documents to see what reasons clients expressed. *Id*. at 9. Plaintiff doubts that a client would expressly state an unlawful reason, but she suspects that discriminatory intent nonetheless would be discernable from "read[ing] between the lines." *Id*. at 9. She adds that Defendant should have known the truth of what was happening. "Considering the number of jobs [she] was removed from, there was no way [Defendant] could not have been aware of the problem," she reasons. *Id*. at 6-7. Instead, Defendant would not return her to the clients' job sites, and that caused her to earn less than she otherwise would. ECF 1 at 26, 28. She lists six such instances of job site removal during March and April 2020 alone for which she calculates $4,360 in lost wages. ECF 36 at 8.

However, those alleged incidents of discrimination and harassment are unrelated to her termination. She was fired on April 14, 2020 after a dispute over untimely paid wages. Her argument is that Defendant did not pay wages by the deadline that Colo. Rev. Stat. § 8-4-103(1)(a) imposes. "The agreed upon pay period at [Defendant] was daily work/daily pay," by which she means each day's wages were due to be paid at the end of that same workday, with late-shift workhours compensated on the next day. *Id*. at 4.

Plaintiff describes Defendant as having a reputation for not paying wages in a timely fashion. She alleges that "[n]ot getting paid or getting paid late was a common practice" and the subject of co-workers' repeat Department of Labor grievances and lawsuits. *Id*. at 2. She herself was frustrated with Defendant, having "been shortchanged by this company many times" (*id*), and

3

experiencing prior instances of delayed payment (ECF 1 at 29). She has records of extensive email and text message correspondence regarding this issue. ECF 36 at 2, 4, 9.

She had been working at supermarket stores in March 2020 doing COVID-related sanitation for which she had problems getting paid. ECF 1 at 26, 29. On the weekend of April 11 and 12, 2020, she was assigned to a nursing home. *Id*. at 28. Because she had forgotten to bring her paysheet with her, she and the client arranged to place her workhours on a co-worker's time sheet. She texted a photo of the pay sheet to her manager at Defendant's office. That Monday, Defendant had not paid for the prior weekend's work. She called her manager to complain. In a post-termination letter to Defendant's Human Resources department, she detailed the various disagreements she had with her manager regarding this issue generally. *Id*. at 28-29.

Plaintiff denies submitting her time sheets in a way that slowed Defendant's ability to process them, the reason Defendant gives for the delays. ECF 36 at 3. However, in her later letter to Defendant's Human Resources department, Plaintiff conceded the use of paper pay sheets was part of the problem. ECF 1 at 26. She also attributed the delayed payment of her wages from working at the retirement home to the *client's* failure to turn in her timesheet. ECF 36 at 8.

The matter came to a head on April 14, 2020 when she complained to her manager about non-payment for her most recent job assignment. "On this particular occasion, [she] got into a heated argument with [him] for repeatedly failing to pay her on time." *Id*. at 2. Indeed, there were "five heated phone calls to [her manager]." *Id*. at 2. It was on this day, *immediately* after the altercation, when her manager fired her, she emphasizes. *Id*. at 2-3. In another filing, Plaintiff added that "[a]fter the fifth or sixth call, [she] finally lost her temper and raised her voice." ECF 27 at 5. She concedes asserting "her demand for payment" in a "very firm" way, but she denies using "any disrespectful terminology or personally insult[ing her manager]." *Id*. at 5. Nevertheless,

4

the manager "interpreted [her behavior] as being insubordinate and terminated her on the spot." *Id*. Her termination "was solely retaliatory for challenging [her manager] on her incompetence and untimely payment." *Id*. at 7. That is also what Plaintiff told the EEOC. In her discrimination charge, she recalled becoming "angry with [her manager who] was incompetent." Her manager told her that she "was being disrespectful and acting insubordinate," and the manager "subsequently discharged [her] on or around April 14, 2020." ECF 11 at 43.

Later that same day, Defendant's website blocked her ability to log in to check job postings. It was when she called Defendant about that technical difficulty that she learned of her termination. *Id*. Defendant did "eventually pay her" the claimed wages, she admits, even if it fired her "for complaining about it." ECF 36 at 2.

On May 25, 2020, a little over a month after her termination, she filed an internal complaint with Defendant's Human Resources department. *Id*. She recites the content of that communication in her initial complaint. ECF 1 at 25-31. In it, she addressed the history of reverse race discrimination and sexual harassment she experienced at job sites over the years. She also complained about being fired "in retaliation for arguing with a Hispanic manager who illegally refused to pay [her]." *Id*. at 26. Plaintiff alleges that the Human Resources department took no substantive action in response, and she construes its inaction as indicative of Defendant's "lackadaisical attitude towards discrimination at their job sites." *Id*. at 2.

On December 18, 2020, Plaintiff filed a complaint with the EEOC. *Id*. She attached to her initial Complaint an image of a "2nd Amended Charge of Discrimination" that references a discrimination date of April 14, 2020. ECF 1 at 33-35. However, the image is small and difficult to read.

5

## LEGAL STANDARDS

**I.     Fed. R. Civ. P. 12(b)(6) Failure to State a Claim**

The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of a plaintiff's complaint. *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pleads facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. *Twombly* requires a two-prong analysis. First, a court must exclude "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Iqbal*, 556 U.S. at 679–80. Second, a court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the well-pleaded averments state a plausible claim for relief, then it survives a motion to dismiss. *Id.* at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014) (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017) (quoting *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011)). "The plausibility standard does not require a showing of probability that 'a defendant has acted unlawfully,' but requires more

than 'a sheer possibility.'" *Parshall v. Health Food Assocs., Inc.*, No. 14-4005-JAR, 2014 WL 2547761, at *1 (D. Kan. June 5, 2014). While the Rule 12(b)(6) standard does not require a plaintiff to establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," so that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has made an allegation, "but it has not shown that the pleader is entitled to relief." *Id*.

**II.     Treatment of a *Pro Se* Complaint**

A federal court must construe a *pro se* plaintiff's "pleadings liberally, applying a less stringent standard than is applicable to pleadings filed by lawyers." *Whitney v. New Mexico*, 113 F.3d 1170, 1173–74 (10th Cir. 1997). The Tenth Circuit interprets this rule to mean that if a court "can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). However, that does not mean that a court should "assume the role of advocate for the *pro se* litigant." *Id.* A court will not

assume fact allegations that have not been pleaded or construct a legal theory on the plaintiff's behalf to round out the complaint. *Peterson v. Shanks*, 149 F.3d 1140, 1143 (10th Cir. 1998).

## DISCUSSION

### I.     Employment Discrimination

The Court begins with Plaintiff's claim of race and gender discrimination.[1] For present purposes the Court assumes that she meets the Tenth Circuit's additional requirement for bringing such a claim on a reverse discrimination theory. To support the inference of discrimination despite membership in a historically favored group, the Plaintiff must show either background circumstances that Defendant is one of those unusual employers who discriminates against the majority or plead facts sufficient to support a reasonable inference that but for her status, the adverse action would not have occurred. *Dickerson v. Bd. of Trustees*, No. 19-cv-02087-WJM-SKC, 2021 WL 492482, at *6 (D. Colo. Feb. 10, 2021); *Johnson v. Shinseki*, No. 11-cv-02881-CBS, 2013 WL 2295433, at *5 (D. Colo. May 24, 2013). The Court notes Plaintiff's allegation that none of the client supervisors at the job sites were white, and Defendant's manager who supervised her was a Hispanic female.

### A.     Hostile Work Environment

Title VII is not a general civility code, and ordinary workplace tribulations or "run-of-the-mill boorish, juvenile, or annoying behavior" does not violate the employment laws. To state a claim, a plaintiff must show more than a few isolated incidents of enmity or a mere offensive utterance. *McElroy v. Am. Family Ins. Co.*, 51 F. Supp. 3d 1093, 1111-12 (D. Utah 2014);

---

[1] In *Jones v. Brookdale Emp. Servs., LLC*, No. 20-cv-03788-MEH, 2021 WL 2660786 (D. Colo. June 29, 2021), this Court also discussed Title VII discrimination law when it dismissed similar claims that Plaintiff had brought against another employer.

8

*Federspill*, 2020 WL 3620323 at 9. Consistent therewith, Plaintiff concedes that "[o]ne offhand comment or inappropriate joke does not constitute racial descrimination by itself." ECF 36 at 6.

Instead, to base a Title VII claim on a hostile work environment, Plaintiff must show a workplace that was permeated with discriminatory intimidation, ridicule, and insult to the degree it creates an abusive working environment. *Federspill v. Denver Public Sch.*, No. 17-cv-01480-WJM-STV, 2020 WL 3620323, at *9 (D. Colo. Jan. 22, 2020). Paralleling that standard, Plaintiff alleges that she "was the frequent recipient of inappropriate comments, racial slurs, and targeted hate attacks on numerous jobs." ECF 36 at 6. However, while the incidents might suffice to portray frequent hostile conduct when considered in total, the flaw with Plaintiff's claim is that each one occurred at a different job site. Moreover, they occurred over several years' span of time.

Plaintiff did not encounter the harassing or discriminatory conduct in Defendant's workspace or from Defendant's employees. Instead, Plaintiff seeks to hold Defendant responsible for how it responded to the problems she was encountering elsewhere. That brings the discussion around to Plaintiff's other Title VII claim, which the Court discusses next.

**B.    Title VII**

An employer may not discriminate against an employee on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(2). The elements of Title VII discrimination are: (1) membership in a protected class, (2) an adverse employment action, (3) qualification for the position, and (3) less favorable treatment than others not in the protected class. *Khalik*, 671 F.3d at 1192. Alternatively, Title VII discrimination is defined as (1) membership in a protected class, (2) an adverse employment action, and (3) circumstances from which unlawful discrimination may be inferred. *EEOC v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007). Plaintiff need not establish prima facie elements to survive a Rule 12(b)(6) motion so long as she alleges sufficient facts that

plausibly would allow a factfinder to find a Title VII violation. *Fuller v. Kansas Dep't of Children & Families*, No. 16-2415-DDC-JPO, 2018 WL 4361187, at *4 (D. Kan. Sept. 13, 2018).

Plaintiff offers a theory about how Defendant could have known of the discriminatory actions that she was encountering at client job sites. Next, she identifies adverse employment actions by Defendant in the form of removing her from those places (which reduced her income). The flaw with her theory is that she does not plead what Defendant *should* have done instead to comply with Title VII. According to Plaintiff, a client may request Defendant not to return a temporary worker. Even if Defendant knew of her race or gendered-based harassment at a client workplace, Plaintiff does not explain what action Defendant failed to take for which it should be held liable. Presumably, her argument is that Defendant should have allowed her to remain at the subject job sites, which is what her request to recover lost income implies. It is unclear how Defendant could have compelled the result that Plaintiff prefers (her return to the job sites) and corrected the problems she was encountering there (for which it was not responsible). In short, Plaintiff does not plead a plausible causal relationship between discriminatory conduct and Defendant's actions or responsibility.

In addition to meeting the precise legal definition of an actionable Title VII claim, Plaintiff also must satisfy the pre-lawsuit administrative prerequisite to bring it in federal court. Exhaustion of administrative remedies is a prerequisite to a Title VII lawsuit. It serves two purposes. It gives notice to the employer of the employee's grievance. *Smith v. Cheyenne Retirement Investors, LP*, 904 F.3d 1159, 1164 (10th Cir. 2018). It also gives EEOC the opportunity to resolve the dispute between the employee and employer. To fulfill those goals, the employee must make a good faith effort to cooperate and provide all relevant, available information to EEOC. *Cirocco v. McMahon*, 768 F. App'x 854, 859 (10th Cir. 2019).

A complainant also has a certain time frame within which to seek administrative relief. Title VII gives an aggrieved employee 180 days to file an administrative charge of discrimination, or alternatively, 300 days if the employee first filed it with an authorized state agency. *Daniels v. United Parcel Service, Inc.*, 701 F.3d 620, 628 (10th Cir. 2012) (citing 42 U.S.C. § 2000e-5(e)(1)). Defendant argues that the 300-day timeframe applies here. ECF 46 at 12. The 300-day timeframe begins to run when the employee receives notice of the adverse employment action. *Daniels*, 701 F.3d at 628. "A claim not filed within these statutory limits is time-barred." *Branch v. United Parcel Service, Inc.*, No. 18-cv-03358-PAB-KLM, 2019 WL 5104789, at *4 (D. Colo. July 22, 2019) (citing *Daniels*, 701 F.3d at 628). Consequently, only those alleged discriminatory adverse acts that occurred 300 days before the filing of the state EEOC charge are potentially actionable in federal court.

The image of the EEOC charge that she submits into the record appears to have been signed on March 18, 2021. ECF 1 at 33. However, that document is entitled "2nd Amended Charge of Discrimination," which implies that it was not the initial filing. Plaintiff pleads that she "filed a complaint with the EEOC on or around 12-18-20." ECF 36 at 2. For present purposes, the Court assumes that December 18, 2020 is when she first sought administrative relief from the EEOC. Consequently, any adverse action that occurred before February 22, 2020 is time-barred. That limits the scope of her claim to those six jobs from which she was removed in March and April 2020 that she identifies at page 8 of her SAC. However, as the Court explains above, Plaintiff does not plead how the act of being removed from a job assignment at a client's request was motivated by unlawful discriminatory animus to create the necessary causal relationship for Title VII liability.

Moreover, Plaintiff raises no plausible claim of Title VII *retaliation* (construing the SAC broadly to include such a claim). The record shows that she first informed Defendant's Human Resources department of the discrimination and harassment on May 25, 2020, *after* she already had been terminated for an unrelated reason. "By its nature, retaliation must occur after the protected activity, not before." *Chen v. Dillard Store Servs., Inc.*, No. 13-2358-CM, 2016 WL 107933, at *15 (D. Kan. Jan. 8, 2016).

## II.  Wage Claim Retaliation

The underlying right that Plaintiff is asserting comes from the wage payment schedule that Colo. Rev. Stat. § 8-4-103(1)(a) creates. That statute sets a maximum length of time between pay periods, for which it permits as an exception the situation when "the employer and the employee . . . mutually agree on any other alternative period of wage . . . payments." *Id*. Plaintiff alleges the existence of such an agreement between Defendant and her for the payment of each day's wage at the end of that same day and of a late shift wage on the very next day. The FLSA is less precise in how it defines the prompt payment of wages, requiring only the "on time payment for work performed" "on the regularly scheduled paydays." *Girolamo v. Cmty. Physical Therapy & Assocs., Ltd.*, No. 15-cv-02361, 2016 WL 2909649, at *4 (N.D. Ill. May 19, 2016) (citing *Martin v. U.S.*, 117 Fed. Cl. 611, 621 (2014)). For present purposes only, the Court assumes as true that: Defendant is bound by a same-day wage payment plan which did not permit it to wait until Monday or Tuesday to pay the wages an employee earned during the preceding weekend. The Court also construes in Plaintiff's favor that her act of requesting Defendant to make payment within the timeframe of the plan is an act that both Colo. Rev. Stat. § 8-4-103(1)(a) and the FLSA protects and thus potentially can serve as the basis for a retaliation claim.

Both the CWCA (at Colo. Rev. Stat. § 8-4-120) and the FLSA (at 29 U.S.C. § 215(a)) prohibit an employer from retaliating against an employee's invocation of wage protection rights. The Court in *Ott v. ChaCha in Art, LLC*, 506 F. Supp. 3d 1133, 1144 (D. Colo. 2020) described the two statutes as "generally the same." Defendant states that the same prima facie elements define unlawful retaliation under both statutes. ECF 46 at 8. Citing *Inniss v. Rocky Mountain Inventory, Inc.*, 385 F. Supp. 3d 1165, 1169 (D. Colo. 2019), it identifies those shared prime facie elements as: (1) Plaintiff engaged in protected activity, (2) Plaintiff suffered adverse action by Defendant after or contemporaneously with the protected activity, and (3) a causal relationship between Plaintiff's protected activity and Defendant's adverse action. The Court adds that the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies to a wage violation claim. *Bracamontes v. Bimbo Bakeries U.S.A., Inc.*, No. 15-cv-02324-RBJ, 2016 WL 5791202, at *4 (D. Colo. Sept. 30, 2016). That analytical framework places the initial burden on Plaintiff to make the above prima facie showing. If she does so, then the burden shifts to Defendant to state a legitimate reason for the adverse action, after which Plaintiff is given the opportunity to rebut it as pretext. *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1114-15 (10th Cir. 2007) (describing *McDonnell Douglas*' means for evaluating circumstantial evidence of unlawful motive).

The Court construes the first element in Plaintiff's favor. Case law construes the wording of the FLSA's anti-retaliation provision broadly to cover not only litigation activity but also "complaints" in the informal sense of unofficial assertions of rights in the workplace. *Bracamontes*, 2016 WL 5791202 at *4. Given their similarity in wording, the Court gives Plaintiff the benefit of an equally broad construction of CWCA's anti-retaliation statute. Consequently, the Court proceeds on the assumption that Plaintiff may base a CWCA retaliation claim on just her act

13

of complaining to her manager at work about late wage payments. Likewise, her termination constitutes an adverse action. As a result, the Court finds that she pleads the first and second elements of the prima facie case.

However, she does not plead a causal relationship between them, as the third element requires. Preventing the inference that Defendant terminated her *because of* her wage payment demand is the presence of a legitimate reason to discharge her. In her SAC, Plaintiff asserts that employers may not "terminate someone's employment when complaining about non-payment of wages simply because they don't like the tone of the complainant's voice." ECF 36 at 3. On this particular point, Plaintiff is incorrect. An employer may fire an employee for any reason whatsoever or no reason at all—just not for an *unlawful* reason. *Riggs*, 497 F.3d at 1118-19. Plaintiff describes her approach on that day as "very firm" and the several conversations as "heated." Plaintiff adds that the manager reacted negatively to her approach, and she admits insubordination (or at least Defendant's perception of such) was a reason Defendant gave for firing her. In this way, Plaintiff not only pleads the existence of a legitimate reason for her termination, but also confirms it as a reason Defendant actually expressed at the time.

The Court adds that the temporal aspect of what happened does not support an inference of unlawful motive. Plaintiff emphasizes how the manager fired her on April 14, 2020 *immediately* after she complained about late wage payments. That fact in isolation might support a finding of a causal relationship. However, Plaintiff also describes a long history of complaining about late wage payments that preceded her termination by months and years. Generally speaking, a causal relationship still may be inferred from a long span of time between the first complaint and termination if there was a history of *ongoing* complaints that led up to it. *Inniss*, 385 F. Supp. 3d at 1170 (accepting the allegation of complaints that continued over four months before termination

14

as permitting a causal inference). In this situation, by contrast, there is the matter of *how* she complained about late wage payment on the day when she was fired. What distinguished her many previous complaints (that did not result in termination) from her complaints on April 14, 2020 was the negative way in which she asserted it. Plaintiff may disagree whether the degree of her conduct rose to the level of insubordination, but she concedes that Defendant perceived it as such. That factor weighs against inferring unlawful retaliatory motive as the cause for her termination.

Lastly, the pleadings indicate a legitimate reason for why wages were paid late in the first place. She herself attributes the non-payment of her wages for the work done the weekend before April 14, 2020 to reasons beyond Defendant's control.

Plaintiff does not plead a plausible CWCA or FLSA claim of unlawful, retaliatory termination according to the precise legal definition of that cause of action. She does not do so even after construing many points in her favor.

### III.   Termination Against Public Policy

Plaintiff's third claim is for wrongful termination in violation of public policy. To state that cause of action under Colorado common law, Plaintiff first must show that Defendant directed her to perform an illegal act or alternatively prohibited her from performing a public duty or exercising an important job-related right or privilege. Second, the required act must violate a specific statute relating to the public health, safety, or welfare, or it must undermine a clearly expressed public policy relating to Plaintiff's basic responsibility as a citizen or her employment rights or privileges. Third, Defendant fired her because she refused to comply, and fourth, Defendant knew or reasonably should have known that Plaintiff refused to do so because of her reasonable belief that it was illegal, contrary to clearly express statutory policy relating to her duty as a citizen, or

violative of her employment rights or privileges. *Jaynes v. Centura Health Corp.*, 148 P.3d 241, 243 (Colo. App. 2006).

Matters that affect society at large and the protection of clear, substantive public policy are the primary concern of this cause of action. *Crawford Rehab. Servs., Inc. v. Weissman*, 938 P.2d 540, 553 (Colo. 1997). It is not meant to interfere with an employer's business decisions or the precepts of at-will employment. *Id*. Nor is it meant to protect solely the affected employee's interests. *Id*. Plaintiff's attempt to reframe her grievance about late payment of wages into a broader subject of concern that affects Defendant's other employees is unavailing. Although the Court permits her to base her retaliation claim on Defendant's alleged failure to pay each day's wages on that same day, it does so only after construing several points in her favor. The law does not elevate that concern to the level of a public policy matter of sufficient gravity and clarity for this cause of action to cover.

Moreover, the retaliation cause of action already provides an avenue of relief. The matter of "public policy" that Plaintiff identifies is the protection that she contends the CWCA and FLSA provide her to request timely wage payment. Because those statutes already provide her a means for redress, she may not use them to bring this cause of action. *Armani v. Maxim Healthcare Servs., Inc.*, 53 F. Supp. 2d 1120, 1132 (D. Colo. 1999); *Gamble v. Levitz Furniture Co.*, 759 P.2d 761, 766 (Colo. App. 1988); *Corbin v. Sinclair Mktg., Inc.*, 684 P.2d 265, 267 (Colo. App. 1984).

## IV.     Leave to Amend

Dismissal of a case is a harsh remedy, and a *pro se* litigant's pleadings are to be construed liberally. As a general rule, therefore, a court may give such a litigant the opportunity to amend the complaint to cure a pleading defect. *Hall*, 935 F.2d at 1109–10; *Reynoldson v. Shillinger*, 907 F.2d 124, 126 (10th Cir. 1990). A court may dismiss a complaint without an opportunity to amend

if "it is patently obvious that plaintiff could not prevail on the facts alleged, and allowing [her] an opportunity to amend [her] complaint would be futile." *Curley v. Perry*, 246 F.3d 1278, 1281–82 (10th Cir. 2001) (quoting *Hall*, 935 F.2d at 1110). Such is the case here. Despite previous opportunities to amend, including in response to Defendant's first motion to dismiss, Plaintiff still fails to plead a plausible claim for relief.

## **CONCLUSION**

The range of wrongdoing that Plaintiff attributes to Defendant is very narrow. Precipitating this lawsuit is her frustration with not being paid as quickly as she believes Defendant is required to do. She adds to her retaliation-based theories of relief the grievance about being removed from job sites where she encountered hostility and harassment. Obtaining judicial relief requires her to present her grievance in terms of a cognizable cause of action. That requires her to plead a plausible causal relationship by which to hold Defendant liable, but the facts particular to this situation hinder, rather than permit, an inference of wrongful motive to permit moving forward with her claims.

Accordingly, this Court respectfully recommends[2] that Defendant's Motion to Dismiss [filed April 15, 2022; ECF 46] be **granted** as to all claims for relief with prejudice and without leave to amend. The Court further recommends that this case be closed.

---

[2] Be advised that all parties shall have fourteen (14) days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. Fed. R. Civ. P. 72. The party filing objections must specifically identify those findings or recommendations to which the objections are being made. The District Court need not consider frivolous, conclusive or general objections. A party's failure to file such written objections to proposed findings and recommendations contained in this report may bar the party from a *de novo* determination by the District Judge of the proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1). Additionally, the failure to file written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy may bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted or adopted by the District Court. *Duffield v.*

Dated at Denver, Colorado, this 16th day of June, 2022.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge

---

*Jackson*, 545 F.3d 1234, 1237 (10th Cir. 2008) (quoting *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991)).